








USDC SCAN INDEX SHEET

MAM 3/8/04 9:49

3:02-CV-01900 SANYO ENERGY V. BYD COMPANY LIMITED

*132*

*P/A.*

ORIGINAL

Stuart Lubitz (Cal. Bar No. 035471)
Laurence H. Pretty (Cal. Bar No. 56019)
HOGAN & HARTSON L.L.P.
500 South Grand Avenue, Suite 1900
Los Angeles, California 90071
Telephone: (213) 337-6700
Facsimile: (213) 337-6701

Attorneys for Plaintiff
SANYO ENERGY (USA) CORPORATION

FILED
MAR 5 2004
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SANYO ENERGY (USA) CORPORATION, a Delaware corporation,

Plaintiff and Counter-defendant,

v.

BYD COMPANY LIMITED, a People's Republic of China joint stock limited company, BYD AMERICA CORPORATION, an Illinois corporation

Defendants and Counter-claimants.

Case No. 02-CV-1900B (AJB)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE EXPERT REPORT OF DR. KIMIO KINOSHITA**

[To be heard concurrently with Motion to Preclude Defendants from Offering Dr. Kimio Kinoshita and Professor Robert L. Snyder as Additional Testifying Expert Witnesses Filed on February 27, 2004]

(Assigned to Magistrate Judge Anthony J. Battaglia)

Date: April 2, 2004
Time: 9:00 a.m.
Courtroom: A

POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE EXPERT REPORT OF DR. KIMIO KINOSHITA

CASE NO. 02-CV-1900B (AJB)

132

\\\LA - 89207/0001 - 196410 v1

## I. INTRODUCTION

Plaintiff Sanyo Energy (USA) Corporation ("Sanyo") moves to exclude the entire expert report of Dr. Kimio Kinoshita dated February 25, 2004 and served on Sanyo on February 27, 2004 (the "Kinoshita Report").

Sanyo seeks exclusion of the Kinoshita Report for the same reasons Sanyo moved to preclude Defendants BYD Company Ltd. and BYD America Corporation ("defendants" or "BYD") from offering Dr. Kinoshita as an additional testifying expert witness.[1] First, BYD designated Dr. Kinoshita as an expert well past the Court's June 6, 2003 deadline and, therefore, is not permitted to submit a report under Rule 26 (a)(2)(B) or Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure. Second, the Kinoshita Report is duplicative and cumulative to the report of another BYD expert witness, Jeffrey Dahn. Requiring Sanyo to dedicate time and resources to address the Kinoshita Report in addition to the expert report by Professor Dahn (the "Dahn Report") on the same issues is unfair and overly burdensome.

If the Court allows BYD's late designation of Dr. Kinoshita as an additional testifying expert witnesses and allows his expert report, Sanyo alternatively moves this Court for entry of an order permitting Sanyo two weeks from the date of the Court's ruling to designate a rebuttal expert and to serve an expert report rebutting the Kinoshita Report. It would be unfair and prejudicial to require Sanyo to rebut Dr. Kinoshita's report by March 12, 2004 (the current deadline to serve rebuttal expert reports) without a ruling by the Court on Sanyo's motions to preclude Dr. Kinoshita as a testifying expert and to exclude his report.

///

///

///

///

[1] This motion to exclude the Kinoshita Report is filed as a companion motion to Sanyo's Motion to Preclude Defendants from Offering Dr. Kimio Kinoshita and Professor Robert L. Snyder as Additional Testifying Expert Witnesses filed on February 27, 2004. The two motions will be heard together on April 2, 2004.

POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE EXPERT REPORT OF DR. KIMIO KINOSHITA

1

CASE NO. 02-CV-1900B (AJB)

\\LA - 89207/0001 - 196410 v1

## II. FACTUAL BACKGROUND

### A. BYD's Designation of Dr. Kinoshita is Untimely

1. The Court Set a June 6, 2003 Deadline to Designate Case-In-Chief Experts

On January 30, 2003, then-Magistrate Judge Burns issued an Order setting a fact discovery cut-off date of July 31, 2003. See Order: (1) Following Early Neutral Evaluation Conference, and (2) Setting Case Management Schedule, at ¶ 2 (Jan. 30, 2003). Judge Burns's Order also contained the following provisions regarding expert designation and disclosure:

> 5. The parties shall designate their respective case-in-chief experts in writing by **June 6, 2003**. Rebuttal experts shall be designated on or before **June 20, 2003**. The written designations shall include the name, address and telephone number of the expert and a reasonable summary of the testimony the expert is expected to provide. The list shall also include the normal rates the expert charges for deposition and trial testimony. [Emphasis added.]
>
> 6. On or before August 4, 2003, each party shall comply with the disclosure provisions in Rule 26(a)(2)(A) and (B) of the Federal Rules of Civil Procedure.
>
> 7. Any party shall supplement its disclosure regarding contradictory or rebuttal evidence under Rule 26(a)(2)(C) on or before August 22, 2003.

Id.

This Court later extended the fact discovery cut-off date three separate times.[2] None of the requests for continuances (whether by stipulation or on defendants' application) sought an extension of the June 2003 deadlines to designate case-in-chief and rebuttal experts, and none of the Court-ordered continuances extended these deadlines. See Dkt. Nos. 74, 83 and 103. The most recent scheduling Order, in addition to extending the fact discovery cut-off date to February 27, 2004, contains the following provision regarding the deadline to the file opening and rebuttal expert reports:

---

[2] Pursuant to the parties' stipulations, this Court extended the fact discovery cut-off date to September 30, 2003 and then to December 5, 2003. On December 15, 2003, after denying defendants' application for a continuance, this Court issued an Amended Order Regulating Discovery and Other Pretrial Proceedings, and yet again, extended the fact discovery cut-off date to February 27, 2004. Amended Order Regulating Discovery and Other Pretrial Proceedings, at ¶ 1 (Dec. 15, 2003).

> 2. All expert disclosures required by Rule 26(a)(2) shall be served on all parties on or before February 27, 2004. Any contradictory or rebuttal information shall be disclosed on or before March 12, 2004. In addition, Rule 26(e)(1) imposes a duty on the parties to supplement the expert disclosures made pursuant to Rule 26(a)(2)(B) by the time that pre-trial disclosures are due under proposed Rule 26(a)(3) (discussed below).

Amended Order Regulating Discovery and Other Pretrial Proceedings, at ¶ 2 (Dec. 15, 2003).

2. BYD Did Not Designate Dr. Kinoshita as a Testifying Expert Until February 17, 2004

BYD first identified Dr. Kinoshita as a "consultant[]" for defendants on January 6, 2004. See Declaration of Sheri T. Cheung in Support of Motion to Exclude Expert Report of Dr. Kimio Kinoshita ("Cheung Decl.") dated March 4, 2004, ¶ 2, Exh. 1. Shortly thereafter, Sanyo requested BYD to confirm Dr. Kinoshita would not be testifying as an expert witness at trial, since he had not been identified until *after* the June 2003 deadlines for designating case-in-chief and rebuttal experts. Id., ¶ 3, Exh. 2. BYD responded that it had "not decided whether or not to have [Dr. Kinoshita] testify at trial," and if Sanyo did not agree to his late designation, "BYD will move for leave to so amend [the January 30, 2003 Order.]" Id., ¶ 4, Exh. 3.

Without seeking leave to amend the January 30, 2003 Order – as it previously conceded was necessary to do – BYD designated Dr. Kinoshita as a testifying expert on February 17, 2004. See id., ¶ 5, Exh. 4. BYD's designation of Dr. Kinoshita as a testifying expert comes eight months after the Court's June 6, 2003 deadline and 10 days before the February 27, 2004 deadline to file opening expert reports. Sanyo, therefore, objected to the late designation of Dr. Kinoshita as a testifying expert. Id., ¶ 6, Exh. 5.

**B. The Kinoshita Report Is Cumulative to the Dahn Report**

Initially, on June 6, 2003, BYD timely designated Professor Dahn as its case-in-chief expert to testify on, among other things, "the invalidity and unenforceability of the '138 patent." Id., ¶ 7, Exh. 6, at p. 2, line 3. On February 17, 2004, BYD attempted to designate Dr. Kinoshita to testify on matters that "go[] to both the invalidity and the enforceability of the '138 patent." See Id., ¶ 5, Exh. 4, at p. 2, line 13.

POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE EXPERT REPORT OF DR. KIMIO KINOSHITA

3

CASE NO. 02-CV-1900B (AJB)

\\\LA - 89207/0001 - 196410 v1

Professor Dahn served his opening report on February 27, 2004 and addressed BYD's claim of invalidity and enforceability of the '138 patent. Id., ¶ 8, Exh. 7, at ¶¶ 38, 46-69. Likewise, Dr. Kinoshita served his opening report on February 27, 2004 indicating that he "reviewed Prof. Jeffrey Dahn's Expert Report in this matter [and] share the opinions Professor Dahn expressed in his expert report." Id., ¶ 9, Exh. 8, at ¶37. The Kinoshita Report essentially duplicates the opinions expressed by Professor Dahn, with respect to the alleged invalidity and enforceability of the '138 patent, as well as his basis and reasons therefore. See id., Exh. 8, at ¶¶ 10-37.

The following chart sets forth some examples of how the Kinoshita Report is cumulative to the Dahn Report with respect to invalidity and enforceability of the '138 patent:

| KINOSHITA REPORT | DAHN REPORT |
|---|---|
| I reviewed in detail U.S. Patent No. 5,686,138. I conclude as a result of that review that a **substantial amount of material property data reported in the '138** patent are so contradictory, or so far outside of the expected range of values reported and accepted by the scientific community in lithium ion battery research, as to be **unbelievable**. ¶ 10 [emphasis added]. | I have also reviewed in detail U.S. Patent No. 5,686,138. I conclude as a result of that review that a **substantial amount of data in that patent** is incapable of being obtained and, therefore, **must be false**. ¶ 46 [emphasis added. |
| **Table 16 and Figure 23** | |
| **Table 16** of the '138 patent also tabulates five physical parameters for graphitic carbon samples A1-A8 having substantially the same $d_{002}$ value, specific surface area and average particle size, but various $L_c$ values and true densities. **Fig. 23** is a graph showing the discharge capacities versus $L_c$ values for these samples. **The low $L_c$ values of 6.7 Å and 127 Å for samples A1 and A2, which have the same $d_{002}$ spacing of 3.354 Å, are unbelievable**. Even with carbon blacks, which are amorphous carbons having large $d_{002}$ values, typical $L_c$ values exceed 10 Å. **I don't believe that such a small $L_c$ dimension as 6.7 Å for sample A1 can be accurately determined using conventional x-ray diffraction techniques. The low true densities of 1.42-1.80 g/cm$^3$ for graphite samples A1, A2 and A3, each having a $d_{002}$ value of 3.354 Å are also unbelievable**. For | In a table in the middle of **Fig. 23**, the graphite materials represented by data points A1, A2 and A3 are shown to have a $d_{002}$ of 3.354 Å each and $L_c$ values of 6.7 Å, 127 Å, and 185 Å, respectively. As I discussed above in paragraphs 16-18, in graphitizable carbon material, the layer spacing in the c-axis direction ($d_{002}$) and the crystallite size in the c-axis lattice direction ($L_c$), as measured by x-ray diffraction techniques, bear an empirical relationship known in the art. **Therefore, I am certain that the $L_c$ values of 6.7 Å and 127 Å attributed to data points Al and A2 cannot be obtained, as the graphite materials corresponding to these data points have a $d_{002}$ value of 3.354 Å.** The $L_c$ value for data point A3 also is questionable in my mind, but |

POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE EXPERT REPORT OF DR. KIMIO KINOSHITA

4

CASE NO. 02-CV-1900B (AJB)

\\\LA - 89207/0001 - 196410 v1

| | |
|---|---|
| **value of 3.354 Å, are also unbelievable.** For graphites with such high crystallinity, the true density should be approximately 2.26 g/$cm^3$, as reported for samples A4-A8. Particularly disturbing is that samples A1-A8 do not reflect the substantially one-to-one relationship between true densities and $d_{002}$ values that exists by virtue of the graphite crystalline structure. Therefore, **I conclude that the above-discussed data is false.** ¶ 21 [emphasis added]. | perhaps might be obtainable. **Because of the empirical relationship, I also do not believe that for the same $d_{002}$ of 3.354 Å it is possible to achieve an $L_c$ going from 6.7 Å to 2000 Å, as shown in Figure 23.** ¶ 47 [emphasis added].<br><br>One might, however, be able to achieve a variation in $L_c$ from about 200 Å all the way up to 2000 Å for the same $d_{002}$ of near 3.354 Å. Still, it is a stretch of one's imagination to even have an $L_c$ of 200 Å to 330 Å at a $d_{002}$ of 3.354 Å, an $L_c$ of 6.7 Å and an $L_c$ of 127 Å are absolutely impossible. **I conclude that this data is false.** ¶ 48 [emphasis added].<br>....<br>Further, as I explained in paragraph 38, the true density of a graphite material is related to the lattice parameter $d_{002}$ value. **Therefore, I question the data in Fig. 23, which shows graphite materials having the same $d_{002}$ value of 3.354 Å, yet having true densities that vary over the range of 1.42 g/$cm^3$ to 2.25 g/$cm^3$.** As I stated in paragraph 38 above, I do not believe it possible to have a true density of less than 2.0 g/$cm^3$ for a carbonaceous material having a $d_{002}$ value less than 3.370 Å. **Therefore data points A1, A2 and A3 are suspect for this reason as well.** ¶ 52 [emphasis added].<br>....<br>Tables 16 through 26, likewise, have the same problems that I have described above in connection with Figures 23 through 31. ¶ 67. |
| **Table 17 and Figure 24** | |
| **Table 17** of the '138 patent also tabulates five physical parameters for graphitic carbon samples B1-B8 having substantially the same $d_{002}$ value, specific surface area and average particle size, but various $L_c$ values and true densities. **Fig. 24** is a graph showing the discharge capacities versus $L_c$ values for these samples. Fig. 2 in Maahs (Exhibit E) shows a clear correlation between the $d_{002}$ spacing and the $L_c$ value of graphitic carbons. The $L_c$ values are shown to be at least 200 Å for $d_{002}$ spacing no greater than 3.37 Å, for a variety of graphitic carbons. Maahs further shows that the $L_c$ value is at least 375 Å for a $d_{002}$ value | Turning to **Fig. 24**, I have the **same comments as I had with respect to Fig. 23** for the data that is associated with data points B1, B2 and B3. Here, the specific surface area in $m^2$/g varies from 6.7 to 7.2. However, $L_c$ is shown to vary from 7.3 Å to 2000 Å, and true density is shown to vary from 1.59 g/$cm^3$ to 2.23 g/$cm^3$, for a $d_{002}$ of 3.359 Å. Again, **this is impossible.** ¶ 53 [emphasis added].<br>....<br>Therefore, the **material properties associated with the data points of Figs. 24 and 25,** |

| | |
|---|---|
| the $L_c$ value is at least 375 Å for a $d_{002}$ value that is about 3.36 Å. Some of the data (B1-B5) in Table 17 are clearly in conflict with Maah's results in Exhibit E. **Similar to samples A1-A3 discussed in paragraph 21 above, the low $L_c$ values and true densities for samples B1-B4 are not believable.** ¶ 22 [emphasis added]. | especially those material properties associated with data points B1 and B2 and C1 and C2 are, in my opinion, **complete fabrications.** ¶ 55 [emphasis added]. <br> .... <br> Tables 16 through 26, likewise, have the same problems that I have described above in connection with Figures 23 through 31. ¶ 67. |
| **Tables 18-24 and Figures 25-31** | |
| **Tables 18-24** of the '138 patent each also tabulate five physical parameters for graphitic carbon samples C1-C7, D1-D8, E1-E8, F1-F8, G1-G8, H1-H8 and I1-I8. In each table, the graphite samples have substantially the same $d_{002}$ value, specific surface area and average particle size, but various $L_c$ values and true densities. **Figs. 25-31** each show discharge capacities versus $L_c$ values for corresponding graphitic carbon samples. The samples of Tables 18-24 do not reflect the substantially one-to-one relationship between true densities and $d_{002}$ values that exists by virtue of the graphite crystalline structure. Further, samples C1, D1, E1, F1, G1, H1 and I1 are each reported to have an $L_c$ value that is less than 10 Å. This small $L_c$ value represents a material having crystallites that are, on the average, less than 3 layer planes thick. (For example, C1 which is reported to have an $L_c$ value of 5.0 Å for a graphite having a $d_{002}$value of 3.362 Å, is a material having crystallites that are, on the average, 2 layer planes thick.) **For a graphitic carbon, such low $L_c$ values are not believable. Therefore, I believe that this data is false.** ¶ 23 [emphasis added]. | Likewise, looking at **Fig. 25**, the $L_c$ value varies from 5 Å to 1800 Å, and true density vary from 1.50 g/cm$^3$ to 2.22 g/cm$^3$, for a $d_{002}$ value of 3.362 Å, 3.363 Å and 3.361 Å. The specific surface area in m$^2$/g varies from 5.0 to 6.1. Again, **this is impossible.** ¶ 54 [emphasis added]. <br><br> Therefore, the **material properties associated with the data points of Figs. 24 and 25**, especially those material properties associated with data points B1 and B2 and C1 and C2 are, in my opinion, **complete fabrications.** ¶ 55 [emphasis added]. <br><br> For similar reasons, I believe the material properties reported in **Figs. 26-31**, especially the material properties of graphite data points D1 and D2 of Figure 26, E1 and E2 of Figure 27, F1 and F2 of Figure 28, G1 and G2 of Figure 29, H1 and H2 of Figure 30 and I1 and I2 of Fig. 31, are simply **fabricated**. In Fig. 29, the $d_{002}$ value associated with data point G3 is large enough that it may represent a graphite material that can be obtained. Note that $d_{002}$ for the graphite varies only from 3.385 to 3.387 and the area in m$^2$/g varies only from 6.8 to 7.3, and yet the $L_c$ value varies over the large range of 6.7 Å to 620 Å. Again, **based on the known relationship between these parameters, these figures just belie imagination.** ¶ 56 [emphasis added]. <br> .... <br> Tables 16 through 26, likewise, have the same problems that I have described above in connection with Figures 23 through 31. ¶ 67. |

| Tables 7, 8, 9, 10, 11 and 12 | |
|---|---|
| The data on the electrochemical performance of graphite in various Li salts and solvents is very limited. The studies were limited to China natural graphite in 21 single solvents and $LiPF_6$. I compared the data in Table 7, Table 11 and Table 12. Despite the different cathodes ($LiCoO_2$, $LiNiO_2$ and $LiMn_2O_4$) used, the same characteristics (i.e., Capacity per unit weight, Initial charge-discharge efficiency, Self discharge rate, Cycle life, charge-discharge efficiency) were reported for China natural graphite in these tables. The same Capacity per unit weight and initial charge-discharge efficiency in these three tables indicate that the cathode did not influence the graphite characteristics – the capacity of the negative electrode is limiting the overall battery capacity. However, if the negative electrode is limiting the battery capacity, then the data in Table 7, 11, and 12 should reflect this. **What I find unbelievable is that, for each electrolyte, the battery capacity is highest in Table 7, which is exactly 50 mAh higher than the corresponding battery capacity in Table 11. Similarly, comparing Table 11 to Table 12, except for the last two entries in Table 12, the difference in corresponding battery capacities is consistently 30 mAh in Table 12.** ¶ 34 [emphasis added].<br><br>I compared the data in Table 7 with the data in Tables 8, 9 and 10. The initial charge-discharge efficiency, Self-discharge rate, Cycle life and charge-discharge efficiency are all the same in Tables 7, 8 and 9. **It is difficult to believe that the Initial charge-discharge efficiency of natural graphite did not change when a second solvent was added to the single solvent.** There were some variations in the Capacity per unit weight, with some of the mixed solvents having values higher than that in the single solvent. The capacity of the batteries with mixed solvent in Tables 8 and 10 (exactly 20 mAh higher in all solvents) are slightly higher than those listed in Table 7. Only the samples in Table 10 show any difference in Self-discharge rate and charge-discharge efficiency from the results in Table 7. **The fact that the initial charge-discharge did not change with electrolyte composition is not believable.** In fact, Fujimoto et al. [footnote omitted] reported that a natural graphite negative electrode could not be | **In Table 7, propylene carbonate is shown in the second row as having a cycle life greater than 500 cycles. This is impossible.** Propylene carbonate as a sole solvent is known to exfoliate the graphite negative electrode and this fact alone would have prevented the cell using propylene carbonate from having more than one cycle. ¶ 60 [emphasis added].<br><br>. . . .<br><br>Turning to Table 7 and comparing Table 7 with Tables 8 and 9, I find, except for the last row of Table 7, Tables 7 and 8 report identical results in the last three columns (i.e., self-discharge rate, cycle life and initial charge-discharge efficiency under "battery characteristics"), even though Table 7 reports graphite and battery characteristics in battery cells using single solvents, while Tables 8 and 9 report graphite and battery characteristics in battery cells using various electrolyte solvents mixed with diethyl carbonate (Table 8) and with dimethyl carbonate (Table 9). From my research, I am familiar with the difference in these battery performance parameters using different electrolyte solvents (e.g., in the '500 patent and my paper with Fong and Spoon [footnote omitted], I reported performance results from lithium ion battery cells using various electrolyte salt and solvent mixtures, including ethylene carbonate (EC), dimethoxyethane (DME), ethylmonoglyme (EMG) and propylene carbonate (PC)). In my experience, these battery performance parameters are sensitive to the electrolyte solvents used. Therefore, **it is impossible that Tables 7, 8 and 9 yield identical results over such a large number of solvent mixtures. I have to conclude that the results in Tables 7-9 are fabricated.** ¶ 62 [emphasis added]. |

| | |
|---|---|
| charged in propylene carbonate (PC), and that gas evolution was observed, which the authors thought was caused by decomposition of the electrolyte. This observation is in agreement with studies of PC and graphite reported by others. Thus, **I cannot believe the results with single solvent PC and graphite in Tables 7, 11 and 12.** ¶ 35 [emphasis added]. | |

## III. ARGUMENT

### A. The Kinoshita Report Should Be Excluded

The Kinoshita Report should be excluded for the same reasons that BYD should be precluded from offering Dr. Kinoshita as a testifying expert witness.

#### 1. Excluding the Kinoshita Report Is Proper Because of BYD's Untimely Designation

In this patent infringement action, Ninth Circuit law governs procedural issues such as the exclusion of an expert witness for failure to comply with a pretrial discovery scheduling order, and the district court has broad discretion to exclude the expert witness. See, e.g., Continental Lab. Prods., Inc. v. Medax Int'l, Inc., 195 F.R.D. 675, 677 (S.D. Cal. 2000) (citing Trilogy Communications, Inc. v. Times Fiber Communications, Inc., 109 F.3d 739, 744 (Fed. Cir. 1997) and Miller v. Safeco Title Ins. Co., 758 F.2d 364, 369 (9th Cir. 1985)).

Numerous courts have ruled that an expert witness designation that is untimely under a discovery scheduling order provides sufficient grounds for exclusion of the expert witness. See, e.g., Continental, 195 F.R.D. at 677 (infringement action); Softel, Inc. v. Dragon Med. & Scientific Communications, Inc., 118 F.3d 955, 961-63 (2d Cir. 1997) (infringement action); Geiserman v. MacDonald, 893 F.2d 787, 790-92 (5th Cir. 1990); Hull v. Eaton Corp., 825 F.2d 448, 451-52 (D.C. Cir. 1987) (stating that district court may preclude belatedly disclosed expert testimony without determining "how badly the party needs the witness"); Pembroke v. City of San Rafael, No. C 92 1869 BAX, 1994 WL 443683, at *3 (N.D. Cal. Aug. 2, 1994).

Here, allowing the Kinoshita Report and requiring Sanyo to rebut the opinions expressed therein rewards BYD's failure to seek leave from the Court for his late designation and "create[s] a burdensome distraction from [plaintiff's] pretrial preparation." See, e.g., IBM Corp. v. Fasco

Indus., Inc., No. C-93-20326 RPA, 1995 WL 115421, at *4 (N.D. Cal. Mar. 15, 1995). Because BYD's attempt to designate Dr. Kinoshita as a testifying expert witness was made over 8 months *after* the Court's June 6, 2003 deadline, the Kinoshita Report should be excluded.

2. Excluding the Kinoshita Report Is Proper Because the Opinions and Bases Expressed Therein Are Entirely Cumulative to those Expressed in the Dahn Report

Courts have found exclusion of an expert witness proper where his testimony is cumulative to that provided by other witnesses. See Cabrera v. Cordis Corp., 134 F. 3d 1418, 1421-1423 (9th Cir. 1998) (Product liability action, wherein 9th Circuit found that trial court did not abuse discretion in excluding the scientific opinion expert testimony of an expert whose testimony "would have been a needless presentation of cumulative evidence."); U.S. v. Marabelles, 724 F. 2d 1374, 1382 (9th Cir. 1984) (Tax evasion case, wherein 9th Circuit affirmed judgment of district court which excluded proposed expert from testifying where proposed testimony was cumulative and duplicative to testimony provided by other witnesses.)

The interests in avoiding cumulative, burdensome presentations and preserving resources applies equally during the discovery phase of litigation. Indeed, this Court has previously denied BYD's motion for letters rogatory on grounds of undue delay and "in light of the cumulative nature of the information sought." See Order re Defendants' Requests for Issuance of Letters Rogatory, p. 5, lines 12-13.

As illustrated by the examples on the chart starting on page 4, the Kinoshita Report is cumulative to the opinions regarding alleged invalidity and enforceability of the '138 patent expressed in the Dahn Report. One timely designated expert should be sufficient to provide this testimony.

Therefore, Sanyo should not be unfairly burdened with the unnecessary cost and misuse of its resources to rebut the Kinoshita Report on matters entirely cumulative of the Dahn Report.

///

///

///

///

POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE EXPERT REPORT OF DR. KIMIO KINOSHITA

9

CASE NO. 02-CV-1900B (AJB)

\\LA - 89207/0001 - 196410 v1

**B. In the Alternative, Sanyo Should Be Allowed Two-Week's Time From the Date of the Court's Ruling To Designate a Rebuttal Expert and to Serve an Expert Report Rebutting the Kinoshita Report.**

If the Court allows BYD's late designation of Dr. Kinoshita as an additional testifying expert witnesses and allows his expert report, Sanyo alternatively moves this Court for entry of an order permitting Sanyo two weeks from the date of the Court's ruling to designate a rebuttal expert and to serve an expert report rebutting the Kinoshita Report. It would be unfair and prejudicial to require Sanyo to rebut Dr. Kinoshita's report by March 12, 2004 (the current deadline to serve rebuttal expert reports) without a ruling by the Court on Sanyo's motions to preclude Dr. Kinoshita as a testifying expert and to exclude his report.

## IV. CONCLUSION

For the foregoing reasons, Sanyo respectfully requests that this Court exclude the Kinoshita Report.

In the alternative, if the Court allows BYD's late designation of Dr. Kinoshita as an additional testifying expert witnesses and allows his expert report, Sanyo requests that this Court permit Sanyo two weeks from the date of the Court's ruling to designate a rebuttal expert and to serve an expert report rebutting the Kinoshita Report.

Date: March 4, 2004

HOGAN & HARTSON L.L.P.

By: [signature]
Stuart Lubitz
Laurence H. Pretty
Attorneys for Plaintiff
SANYO ENERGY (USA) CORPORATION

**PROOF OF SERVICE**

I, Renee Price, declare as follows:

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled cause. My business address is Hogan & Hartson L.L.P., Biltmore Tower, 19th Floor, 500 South Grand Avenue, Los Angeles, California 90071-2611.

On March 4, 2004, I served the foregoing document described as:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE EXPERT REPORT OF DR. KIMIO KINOSHITA**

On all counsel of record in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Alan H. MacPherson, Esq. Telephone: (408) 392-9250
Edward C. Kwok, Esq. Facsimile: (408) 392-9262
MacPherson Kwok Chen & Heid LLP
1762 Technology Drive, Suite 226
San Jose, California 95110

[ ] BY MAIL I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ] BY FACSIMILE I caused said document to be transmitted by facsimile transmission to the number indicated after the address(es) noted above.

[X] BY PERSONAL SERVICE I caused such envelope to be delivered by hand to the addressee(s) as stated above.

[ ] BY FEDERAL EXPRESS I caused such envelope to be delivered to Federal Express for overnight courier service to the offices of the addressee(s) listed on the attached service list.

[ X] FEDERAL I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on March 4, 2004, 2003, at Los Angeles, California.

Renee Price
Name

[signature]
Signature